Filed 6/28/23  S.O. v. Superior Court CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| S.O.,<br><br>    Petitioner,<br><br>    v.<br><br>THE SUPERIOR COURT OF FRESNO COUNTY,<br><br>    Respondent;<br><br>FRESNO COUNTY DEPARTMENT OF SOCIAL SERVICES,<br><br>    Real Party in Interest. | F086122<br><br>(Super. Ct. Nos. 21CEJ300360-1, 21CEJ300360-2, 21CEJ300360-3)<br><br>**OPINION** |

### THE COURT[*]

ORIGINAL PROCEEDINGS; petition for extraordinary writ.  Amythest Freeman, Judge.

Juvenile Law Center and Annette T. Smurr for Petitioner.

No appearance for Respondent.

Daniel C. Cederborg, County Counsel, and Ashley N. McGuire, Deputy County Counsel, for Real Party in Interest.

-ooOoo-

---

[*]    Before Hill, P. J., Levy, J. and DeSantos, J.

Petitioner S.O. (mother), through counsel, seeks an extraordinary writ (Cal. Rules of Court, rules 8.450–8.452) from the juvenile court's orders issued at a combined, contested six- and 12-month review hearing (Welf. & Inst. Code, § 361.21, subds. (e)(1) & (f)(1))[1] terminating her reunification services and setting a section 366.26 hearing as to her son F.O. (born May 2009), and her daughters K.S. (born January 2016) and V.O. (born September 2021) (collectively, the children). She contends the court erred in finding it would be detrimental to return the children to her custody. She requests this court order the section 366.26 hearing vacated and reunification services continued. She also requests a stay of proceedings in the respondent court. We deny the petition and the request for a stay of proceedings.

## FACTUAL AND PROCEDURAL SUMMARY

F.O.'s alleged father is Jesse H. K.S.'s presumed father is Manuel S. V.O.'s presumed father is Anthony S.[2] Mother and Anthony were in an on and off relationship throughout the proceedings.

### A.     Referral and Voluntary Family Maintenance Plan

In September 2021, the Fresno County Department of Social Services (department) received a referral on behalf of the children shortly after mother gave birth to V.O. because she reported using marijuana and methamphetamine and consuming alcohol during her pregnancy, and receiving limited prenatal care. V.O. was born prematurely at 33 weeks gestation and was admitted to the NICU. F.O. and K.S. were staying with mother's friend while she was at the hospital. The department held an imminent risk team decision making meeting and offered mother voluntary family maintenance services. Mother agreed to participate in a safety plan and voluntary

---

[1]     All further statutory references are to the Welfare and Institutions Code.

[2]     Initially, Manuel and Anthony were identified as alleged fathers, but their statuses were eventually elevated to presumed fathers.

services; however, after only a few days, she became noncompliant and informed the department she did not need services. As a result, the department executed a protective custody warrant and detained the children.

**B.      Petition and Detention**

On October 6, 2021, the department filed a petition on behalf of the children pursuant to section 300, subdivision (b)(1) (failure to protect), alleging they were at substantial risk of suffering serious physical harm or illness because mother suffered from substance abuse problems and exposed them to ongoing domestic violence. Mother reported she had used marijuana and methamphetamine and consumed alcohol while pregnant with V.O., and received limited prenatal care. V.O. remained hospitalized because she was having trouble feeding. Mother admitted using controlled substances " 'on and off' " for 25 years. Additionally, she reported past domestic violence with K.S.'s father, Manuel, and current domestic violence with V.O.'s father, Anthony. She identified herself as the aggressor and described the domestic violence as physical.[3]

On October 12, 2021, the juvenile court held a detention hearing. The court found a prima facie case was established, ordered the children removed from mother's custody, ordered mother be offered reunification services and provided with supervised visits, and set a combined jurisdiction and disposition hearing. Mother's services included parenting classes, substance abuse and mental health evaluations with recommended treatment, a domestic violence inventory with recommended treatment, and random drug testing.

**C.      Jurisdiction and Disposition**

*1.      Jurisdiction and Disposition Report*

In its November 2021 jurisdiction and disposition report, the department recommended the allegations in the amended petition be found true, the children be

---

[3]      The department subsequently filed an amended petition, but the allegations remained the same.

adjudged dependents of the court, mother be ordered to participate in reunification services, and the fathers be denied reunification services. The department reported there was a substantial danger to the physical health of the children or the children were suffering severe emotional damage, and there were no reasonable means by which their physical or emotional health could be protected without removing them from mother's custody. Mother had a significant history of substance abuse and domestic violence that negatively affected her ability to provide the children with appropriate care. However, she had acknowledged her substance abuse issues and admitted she needed to participate in substance abuse treatment. Mother wished to reunify with the children and was willing to participate in services, but the department was concerned about her ability to benefit from services as she had previously failed to benefit from voluntary services. Therefore, the department recommended the children not be placed in her care until she had made significant progress and demonstrated she could maintain her sobriety and refrain from engaging in domestic violence. Mother had already begun participating in services and submitting to random drug testing. She tested negative five times, had four no-shows, and tested positive for THC once in October 2021.

### 2. *Jurisdiction and Contested Disposition Hearings*

On November 16, 2021, the juvenile court found the allegations in the amended petition true.

On May 19, 2022, the juvenile court held a contested disposition hearing. The court found reasonable efforts had been made to prevent the children's removal, adjudged them dependents of the court, ordered them removed from mother's custody, and ordered reunification services and supervised visits for mother, Manuel, and Anthony. The court gave the department discretion to progress visits. Mother's reunification services were to include parenting classes, substance abuse and mental health evaluations with recommended treatment, a domestic violence inventory with recommended treatment,

4.

and random drug testing. The court set a combined six- and 12-month status review hearing.

**D.     Six- and 12-Month Status Review and Request to Change Court Order**

*1.     Status Review Report*

In the November 2022 status review report, the department recommended reunification services be terminated for mother and the fathers, and that a section 366.26 hearing be set. The children were still in the same foster home and were thriving. Their care providers were supportive and F.O. and K.S. expressed they wanted to remain in their home. They were willing to provide a concurrent plan of adoption for the children.

Mother had been actively participating in services. She had completed parenting classes and substance abuse treatment, which consisted of an outpatient program. She also completed a mental health assessment but did not meet the medical necessity for treatment. Her domestic violence inventory recommended she participate in a child abuse intervention program. She had completed 24 sessions and had one absence. Her random drug test results consisted of approximately 63 negatives, four no-shows, four excused tests, and four positives for either creatinine, opiates, or methamphetamines.

In September 2022, mother progressed to unsupervised visits. She and her adult children were also authorized to attend F.O.'s sports games. During one game, a male fitting Anthony's physical description was spotted sitting with mother. Mother told F.O. " 'not to say anything.' " The department noted mother made other inappropriate comments during visits. During one visit, mother stated she missed one of F.O.'s games due to work, but stated it did not matter because the " 'county [was] garnishing her wages.' " On another occasion, mother told F.O. the reason he did not want to go back home was because he was going to have a better life and go to a better school.

F.O. reported he enjoyed visiting mother, but was concerned because he had not seen a change in her behavior. He did not feel he or his sisters should return to her care. He was worried mother would fall into old habits and leave them to fend for themselves.

5.

He also worried that if he returned to her care there would be strangers going in and out of the home. He said he did not want to return to that environment as it caused him to be in a "dark head space." Mother continued to have adult conversations with F.O., which caused him more stress. She talked to him about her relationships, her lack of money, her previous arrests, and child support. The social worker informed mother that those conversations stressed F.O. Mother responded she was and would always be open with her children. K.S. reported she enjoyed visiting mother, but worried she might get in trouble but could not elaborate further.

The report indicated that in February 2022 mother had been arrested for a domestic violence incident with Anthony, but was not charged. According to mother, she was in the car with him when he said something offensive and raised his voice. He then got out of the car, punched her rearview mirror, and left. Mother left, but then returned to yell at him. She said "the cameras 'made it seem like she was trying to run him over.' " A few days after her arrest, she told social workers she was going to stay away from Anthony and focus on her reunification goals. However, in March 2022, she reported she wanted to "work it out" with him. In July 2022, she reported she was no longer in a relationship with him and had filed a restraining order against him, but later reported she withdrew it. However, she said he was "still coming around."

The department opined there was reason to believe there continued to be a substantial detriment to the physical health, safety, protection, and physical or emotional well-being of the children if they were returned to mother's care and there were no reasonable means to protect them absent removal. Mother and Anthony continued to engage in domestic violence. Additionally, although mother had shown moderate progress, she had not demonstrated a change in her behavior.

In its assessment of whether reunification services should continue, the department considered whether mother had consistently visited the children, made significant progress, and demonstrated the capacity and ability to complete treatment objectives and

provide for the children's safety and needs. The department noted mother liked to discuss case related topics that impacted F.O.'s mental well-being and often blamed him for not wanting to return to her care. In regard to her progress, although she had made moderate progress in her sobriety, she had not demonstrated significant progress towards remedying her domestic violence issues. Mother often minimized problems and blamed others for issues, including the children. She had not demonstrated she could provide for the children's safety and needs as she continued to make decisions that placed her at risk, including an arrest for domestic violence. Additionally, on two occasions she tested positive for substances and minimized the results, stating she could have tested positive from touching a surface. She reported she was regularly around her sister and Anthony who were frequent users.

### 2. *Request to Change Court Order*

On February 1, 2023, the department filed a "Request to Change Court Order" (JV-180), requesting visits return to supervised. The department claimed mother had been engaging in inappropriate behaviors during unsupervised visits, including smoking marijuana, ignoring F.O., and allowing unauthorized guests to be present during visits and asking the children " 'not to say anything.' " Additionally, she had made statements blaming F.O. for the " 'county … garnishing her wages.' " The children reported they smelled marijuana in the home and saw her smoking with other family members in the garage. K.S. stated that while she liked visiting mother, she had witnessed the family smoking. F.O. reported feeling neglected during visits and only wanted to be present to ensure his sisters were safe. In a recent home visit, F.O. appeared sad and tearful while he shared his worries with the social worker. It was reported F.O. had been returning from visits crying and anxious. He was having emotional outbursts and his grades were beginning to drop. F.O. requested a referral for mental health services. He further requested visits return to a supervised setting because he did not feel safe or protected.

On February 7, 2023, the juvenile court held a hearing and granted the department's request. During the hearing, county counsel confirmed mother tested positive for undisclosed substances in December 2022 and February 2023. Visits were to return to supervised or intensive supervised visits at the department's discretion.

### 3. Addendum Report

An addendum report dated March 2023 provided an update on visits. F.O. reported he felt most comfortable with supervised visits because he did not have to worry about mother breaking any rules. He said he cared for mother, but did not believe she had changed her behavior. He felt relieved and thankful for supervised visits.

The department summarized that supervised visits worked better for the family. When visits were not supervised, F.O. appeared to struggle and worry constantly about mother's behaviors and decisions. Although mother engaged with the children during visits, she often made inappropriate comments like calling V.O.'s shoes " 'ugly.' " It appeared that even during supervised visits F.O. still felt like he had to protect his sisters. F.O. wanted the visits to remain supervised. The department again recommended terminating reunification services and setting a section 366.26 hearing.

### 4. Contested Six- and 12-Month Status Review Hearing

The contested six- and 12-month status review hearing began on March 21, 2023, and lasted three days, concluding on April 13, 2023. By this time, mother had received 18 months of services. The juvenile court heard testimony from F.O., mother's adult daughter, maternal grandmother, the assigned social worker, and mother.

#### a. F.O.'s Testimony

F.O. testified he enjoyed being with his care provider. He described his relationship with mother as "[b]roken." He initially believed mother was being "as successful as a parent as she could be" but he now felt she had "failed as a parent" because she "failed to provide a proper living space" and "give the correct influence." He did not like having unsupervised visits with mother because she was able to not

8.

follow the rules, such as smoking marijuana. He said that if he were to return to her care, he would not feel safe. He did not feel mother had "changed at all." He said, "She's still the same person. She still—although she says she doesn't, I know she does still smoke marijuana or use some type of substance." During unsupervised visits, he smelled marijuana. He confirmed he requested visits return to being supervised because after smelling marijuana he felt the entire family was being put in danger. He did not want to participate in therapeutic visits with mother and did not feel he would be negatively impacted if he did not reunify with her. He explained, "I've been without her for a year. Honestly, the changes that I've undergone are better than what I was initially." He did not want to reunify with her. He explained another reason he did not feel safe during unsupervised visits was because he felt she might keep them longer than the allotted visit time.

### b.     Adult Sibling Viviana G.'s Testimony

Mother's daughter testified she had been present at three visits with mother. One visit occurred at the park and two were at home. She denied anyone smoked marijuana during or prior to the visits, or that it smelled like marijuana. She said mother did not smell of marijuana. She reported neither she nor her wife smoked marijuana in the home, and that they do not smoke at all.

### c.     Maternal Grandmother Virginia O.'s Testimony

Grandmother testified she knew mother had used drugs on and off and could tell when she was under the influence. She said mother stopped using drugs when she had V.O. Grandmother participated in two visits with mother and the children. During one visit, the family held a birthday party for K.S. She denied anyone smoked marijuana prior to or during the visit. Since the children's removal, she said mother became healthier and got a job, but was very sad due to the children's removal.

9.

### d. Social Worker Stefania R.'s Testimony

Stefania testified she had been assigned to mother's case since proceedings began. Mother had completed all services and had tested negative for drugs most of the time. She said that with the exception of her four no-shows and her one positive result for creatinine, mother had been sober since September 2021.[4]

In February 2023, Stefania filed a JV-180 on the basis that mother had been engaging in inappropriate behaviors during unsupervised visits, including smoking marijuana. She acknowledged mother did not test positive for marijuana in January 2023, but believed she tested positive for creatinine in February 2023. When she filed the JV-180, she spoke to the children and mother to investigate the alleged marijuana use. Mother explained to her she submitted to random drug tests that proved she did not smoke marijuana around that time. Stefania checked her random drug test results, which were negative. However, she said the alleged marijuana use was not the only reason for filing the JV-180. F.O. had shared he felt neglected during visits and expressed concerns for their safety. There was a statement in the JV-180 that K.S. had seen family members smoke, but Stefania did not know if she was referring to cigarettes. K.S. reported she liked visiting mother.

Stefania further testified that aside from alleged marijuana use or smell, there were other concerns that led to the department's recommendation to terminate mother's reunification services. She testified mother continued to engage in domestic violence and speak to the children about adult topics. Mother had been arrested for a domestic violence incident. She then attempted to refrain from the relationship and filed a restraining order, but later withdrew it. Mother's withdrawal of the restraining order

---

[4]     Mother tested positive for THC in October 2021, positive for creatinine in December 2021, positive for opiates in March 2022, positive for methamphetamines in April 2022, and positive for undisclosed substances in June 2022, December 2022, and February 2023.

concerned the department. The department eventually progressed mother's visits to unsupervised in a public setting to prevent Anthony from going to the home where the domestic violence was occurring. When unsupervised visits began, the children reported concerns. She said, "[W]hen a child is telling me that he does not feel safe, or he feels that he is constantly having some kind of anxiety or worries, that leaves a lot of concerns for us. And it's also concerning that the domestic violence had continued throughout the case." She said Anthony had been spotted sitting next to mother at one of F.O.'s games. After mother withdrew the restraining order, mother shared with her she thought Anthony was still coming around because her window had been broken.

### e. Mother's Testimony

Mother testified that in her parenting class she learned she was being neglectful and needed to pay more attention to the children. She learned to be a better mother and it had changed her for the better. Through substance abuse treatment, she learned when she was being triggered and when to turn to positive relationships. She said she had three positive creatinine results in December 2021, December 2022, and February 2023. She tested positive for methamphetamine through her substance abuse treatment provider, but not through the random drug testing provider. She explained the tests were different, and the test through the substance abuse provider was more sensitive. She said, "They said it was probably like residue contact or like—I have a sister who is an active drug addict who I have put out of my life now, because possibly being her use at my house." She was asked about the incident in which Anthony allegedly attended F.O.'s football game with her. She denied the incident happened. Mother further testified she was arrested in July 2022 for domestic violence, but the case was dismissed.[5] She then attempted to file a restraining order against Anthony approximately around August 2022, but withdrew it after several unsuccessful attempts to serve him. After she withdrew the

---

[5] The department's report states mother was arrested in February 2022.

restraining order, her tires were slashed a couple of times and she assumed it was him, but she was not certain. The incidents eventually stopped.

In regard to unsupervised visits, she said they usually occurred at restaurants, but she took them to her daughter's house a couple of times. She said her relationship with F.O. had changed. She explained that about seven months after the case started, he "wasn't so loving" towards her even though she treated him the same. She asked him about school, sports, how he was doing, and if he liked living with his foster parents. She said she had always been open and honest with her children about what was going on in her life. She talked to them about financial struggles, but when the social worker informed her those types of conversations were causing F.O. anxiety, she stopped. When asked whether she neglected F.O. during visits she said she did not know how it was possible to neglect him when she only had an hour or two per visit. Even when maternal grandmother was there, most of the talking occurred between F.O. and mother. She said, "I don't see how I would have neglected him." She stated that she had previously sought mental health services for F.O. when one of her children passed away. F.O. had stated he wanted to choke himself so he could be with his baby sister. She took him to therapy once or twice, but stopped taking him because they wanted to put him on medication, and she did not believe in putting children on medication.

Mother testified she wanted F.O. to return to her care, but also did not want him to resent her. She said he had great foster parents and she was very grateful for them as they helped him come out of his shell. She wanted what was best for F.O.

Mother felt she had done everything in her power to rehabilitate herself. She said, "Well, I would say I'm rehabilitated. I don't indulge in no drugs, I don't want to indulge in drugs." Mother did not feel she had done anything wrong in regard to unsupervised visits. She said, "I don't think I did anything wrong even in the ones I was having unsupervised, you know, besides the certain conversations the social worker didn't want me to have with my kids. Other than that, I paid attention to them." She felt she was

12.

attentive to their emotional needs. When asked if she would ever let an Anthony type of person in her life again, she responded that was nowhere near her mind. She said she did not need to let anybody else in her life and just needed to focus on getting her children back, making herself better, continuing to work, maintaining positive relationships, and turning to her higher power. Mother stated she just wanted her children back and wanted a second chance. She said she was being "judged off of something that somebody else does that [she] can't control," and stated she was referring to Anthony.

### f. Juvenile Court's Ruling

In ruling, the juvenile court found mother had made substantial progress and complied with services. The court complimented mother for having done a great job with services, but explained it still had to consider whether it would be detrimental to the children to return them to her custody. The court noted F.O. felt like he had to protect his sisters. The court stated, "It was very telling to me, however, even in some of the small comments that were made, that [F.O.] feels the need to protect—even in the comment as innocent as I can't believe you're wearing [Crocs] … it was telling to me that [F.O.] responded to that comment during one of the visits. And it's in one of the reports that [F.O.] responded to that comment and said, that everybody wears [Crocs] … Or something as innocent as saying, that a house with baby locks isn't a fun house." The court found F.O. to be very credible. The court further pointed out that mother admitted she had been around people who were using drugs and attributed her positive drug test results to that. The court went on, "So I believe that the behavior change that the [d]epartment is wanting to see is you choosing better for yourself so that your children are in a better environment, and unfortunately, with some of these small comments, combined with the fact that [F.O.] … was stating that he wanted to go back to supervised visits, I can't find there would be no detriment to his physical or emotional well-being if he were returned to your care today." The court put great emphasis on F.O.'s stress and anxiety caused by the responsibility of becoming a caretaker at a young age. It stated,

13.

"[I]t's not about adult conversations, kid conversations; it's boundaries. Kids should get to be kids. I don't see that that won't repeat itself." The court found the department provided reasonable services and that "[t]he return of the children to the parents would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the children," and terminated reunification services and set a section 366.26 hearing.

On April 18, 2023, mother filed a notice of intent to file a writ petition.

## DISCUSSION

### I.   Detriment to Return

Mother contends she substantially complied with her reunification services and, therefore, the children should have been returned to her custody. She further argues the evidence on which the court based its detriment finding was insufficient. We disagree and conclude substantial evidence supports the court's detriment finding.

#### A.   Legal Principles

At each review hearing, "there is a statutory presumption that the child will be returned to parental custody." (*In re Marilyn H.* (1993) 5 Cal.4th 295, 308.) At the 12-month review hearing, the child must be returned "unless the court finds, by a preponderance of the evidence, that the return of the child to their parent … would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child. The social worker shall have the burden of establishing that detriment." (§ 366.21, subd. (f)(1).) "The failure of the parent … to participate regularly and make substantive progress in court-ordered treatment programs shall be prima facie evidence that return would be detrimental." (§ 366.21, subd. (f)(1)(B).) However, technical compliance with court-ordered services is not conclusive evidence a parent does not pose a risk of detriment to the child—"the court must [still] consider progress the parent has made towards eliminating the conditions leading to the children's placement out of the home." (*In re Dustin R.* (1997) 54 Cal.App.4th 1131, 1141–1142.)

14.

"[T]he decision whether to return the child to parental custody depends on the effect that action would have on the physical or emotional well-being of the child." (*In re Joseph B.* (1996) 42 Cal.App.4th 890, 899.) Section 366.21 "does not state or imply that, in order to keep a minor out of parental custody, the serious risk of detriment posed by returning the minor to his or her parent must involve the same type of harm which formed the basis for the dependency and the removal of the minor from parental custody. (*Id*. at p. 898.) "By authorizing the continued removal of a child from parental custody based on the risk of either physical or emotional detriment, section[ ] 366.21 … focus[es] on the child's well-being *at the time of the review hearing* rather than on the initial basis for juvenile court intervention. [Citation.] Thus, while the court must consider the extent the parent has cooperated with the services provided and the efforts the parent has made to correct the problems which gave rise to the dependency [citation], the decision whether to return the child to parental custody depends on the effect that action would have on the physical or emotional well-being of the child." (*Id*. at p. 899, italics added.)

## B. Standard of Review

We review a juvenile court's detriment finding for substantial evidence. (*Tracy J. v. Superior Court* (2012) 202 Cal.App.4th 1415, 1424.) " ' "Substantial evidence" is evidence of ponderable legal significance, evidence that is reasonable, credible and of solid value. [Citation.]' [Citation.] 'Inferences may constitute substantial evidence, but they must be the product of logic and reason. Speculation or conjecture alone is not substantial evidence.' " (*Ibid*.) Further, when reviewing for substantial evidence, we do not inquire whether the evidence supports a contrary finding, but whether substantial evidence, contradicted or not, supports the finding actually made. (*Adoption of A.B.* (2016) 2 Cal.App.5th 912, 925.)

## C. Analysis

In the present case, mother substantially complied with all of her court-ordered services. In *Blanca P. v. Superior Court* (1996) 45 Cal.App.4th 1738, 1748 (italics

omitted), the court explained, "The harder cases are, like the one before us, where the parent *has* complied with the service plan, but for some reason has not convinced a psychologist or social worker that it would be safe to return the child to the parent. The problem is not, as it were, quantitative (that is, showing up for counseling or therapy or parenting classes, or what have you) but qualitative (that is, whether the counseling, therapy or parenting classes are doing any good). These are sensitive cases, fraught with emotional overtones, because they invariably deal with an evaluation of the personality, character and attitudes of the parent." Thus, even where the parent has largely complied with the reunification plan, a court may still find that return of the child to the parent would be detrimental based on other factors. (*Constance K. v. Superior Court* (1998) 61 Cal.App.4th 689, 704–705.) The juvenile court "can consider, among other things: whether changing custody will be detrimental because severing a positive loving relationship with the foster family will cause serious, long-term emotional harm [citations]; properly supported psychological evaluations which indicate return to a parent would be detrimental to a minor [citations]; *whether the natural parent maintains relationships with persons whose presence will be detrimental to the ward* [citation]; instability in terms of management of a home [citation]; difficulties a minor has in dealing with others such as stepparents [citations]; *limited awareness by a parent of the emotional and physical needs of a child* [citation]; failure of a minor to have lived with the natural parent for long periods of time [citation]; and *the manner in which the parent has conducted himself or herself in relation to a minor in the past*." (*Ibid*., italics added.)

The issue here remained whether mother had made sufficient progress towards eliminating the reason for removal and the effect that returning the children to her custody would have on their physical and emotional well-being. (*In re Joseph B.*, *supra*, 42 Cal.App.4th at p. 899.) The record contains substantial evidence that despite her compliance in domestic violence treatment, mother was still engaging in domestic violence. She was arrested for engaging in a domestic violence incident with Anthony.

16.

Although the case was dismissed, she admitted she had been arguing with him, he punched her rearview mirror, and after she left, she returned to yell at him. Following the incident, she went back and forth with him for months, and eventually filed a restraining order against him but then withdrew it. After withdrawing the restraining order, she attributed several incidents to him in which he slashed her tires and broke her window. Additionally, as the court noted in its ruling, mother admitted she was putting herself around people who were using drugs. She also had a positive drug test result as recently as February 2023. Mother's insistence that she was no longer engaging in domestic violence and was not using drugs is an invitation to reweigh the evidence and give greater consideration to evidence that is unfavorable to the juvenile court's finding. We must "accept the evidence most favorable to the order as true and discard the unfavorable evidence as not having sufficient verity to be accepted by the trier of fact." (*In re Casey D.* (1999) 70 Cal.App.4th 38, 53.)

Moreover, mother has repeatedly failed to acknowledge the emotional needs of F.O. She denied she neglected him during visits, or that she did anything wrong during unsupervised visits aside from having inappropriate conversations. Yet, the evidence remains that F.O. was experiencing severe anxiety, was returning from visits crying, expressed concerns about their safety during visits, and requested visits be supervised. He felt neglected, but attended visits to ensure his sisters were safe. After unsupervised visits began, he was having emotional outbursts, his grades began dropping, and he requested mental health services. He testified he did not feel safe with mother and did not want to reunify with her. Thus, even during the short periods of unsupervised time mother had with the children, she was unable to show she could provide them with safety and protection. Instead, her visits were returned to being supervised due to safety concerns.

Overall, mother had a problem taking responsibility for her actions. She testified she was being judged for someone else's actions, referring to Anthony. She often blamed

F.O. for not wanting to return to her care and blamed others for her positive drug test results. Accordingly, there remained a substantial risk of detriment to the children if they were returned to mother's care. The evidence sufficiently supported the juvenile court's finding.

## II. The Juvenile Court Did Not Apply the Incorrect Standard of Proof

We briefly address mother's argument that the juvenile court abused its discretion in applying the wrong standard of proof in finding detriment. As we previously stated, at the 12-month review hearing, the child must be returned "unless the court finds, by a *preponderance of the evidence*, that the return of the child to their parent … would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child." (§ 366.21, subd. (f)(1), italics added.) In ruling, the court stated: "So I believe that the behavior change that the [d]epartment is wanting to see is you choosing better for yourself so that your children are in a better environment, and unfortunately, with some of these small comments, combined with the fact that [F.O.] … was stating that he wanted to go back to supervised visits, I can't find that there would be no detriment to his physical or emotional well-being if he were returned to your care today." Mother argues the juvenile court applied the wrong standard because the court stated it could find " 'no' danger," instead of stating "that return of the children would create a risk of 'substantial danger.' " (Capitalization omitted.) First, the court did not use the words "no danger." Second, the standard of proof was a preponderance of the evidence. Lastly, and most importantly, the court properly articulated the standard of proof when it began its ruling, stating: "[L]et me begin with the things that I need to consider: Does the [c]ourt find by a preponderance of the evidence that return of the child to the physical custody of the parent would create a substantial risk of detriment to the child's safety, protection, or emotional well-being?" Accordingly, we conclude the court applied the correct standard of proof.

18.

## DISPOSITION

The petition for extraordinary writ is denied.  The request for a stay of proceedings is denied.